**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DANIEL J. MOORE**
Laszynski & Moore
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| WILLIAM A. PARKS, )<br>)<br> Appellant-Defendant, )<br>)<br> vs. )<br>)<br> STATE OF INDIANA, )<br>)<br> Appellee-Plaintiff. ) | No. 79A04-1305-CR-259 |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Randy J. Williams, Judge
Cause No. 79D01-1209-FA-14

**May 22, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

William A. Parks appeals his sentence for dealing in methamphetamine as a class A felony. Parks raises one issue which we revise and restate as whether his sentence is inappropriate in light of the nature of the offense and the character of the offender. We affirm.

FACTS AND PROCEDURAL HISTORY

On September 15, 2012, Parks, Amanda Gentry, and David Reeve went to Reeve's apartment. Parks told Gentry that he was going to try to cook methamphetamine. Gentry noticed a very strong chemical odor in Reeve's apartment. During the manufacturing process, Reeve knocked over the vessel in which the methamphetamine was being made. The odor became very intense after the contents of the vessel were spilled, and someone opened the windows and door.

That same day, Lafayette Police Officers Kurt Sinks and Scott Clark were dispatched to the scene following a report of a possible methamphetamine lab. Officer Sinks approached the residence, noticed that a window was open, and detected a strong odor when he was about ten feet from the entry way. The odor smelled like nail polish remover and became even stronger as he walked closer to the doorway to the point where his eyes began to water. Officer Clark's eyes became "very red" and "watery" due to the smell that was "very strong." Transcript at 59.

Officer Sinks observed Gentry and Jeffrey Deaton in the residence. Gentry invited Officer Sinks inside, but Officer Sinks declined because he was concerned for his health due to the odor. Officer Sinks asked Gentry and Deaton to come outside, and they complied. After speaking with Gentry, Officer Sinks called for the other person to exit

2

the house. Parks then exited the residence and was "very, very sweaty," "very agitated," and nervous. Id. at 42. Officer Sinks explained to Parks why he was present, and Parks told Officer Sinks that there was no validity to the complaint, that there was no meth lab inside, that there were no drugs inside, and that there were no safety concerns for law enforcement or anyone else.

The police obtained a search warrant and discovered lithium batteries, gallon jugs, an organic solvent, a siphon type tool, coffee filters, and a smoking device. That same day, Indiana State Police Trooper Brock Russell was called to the scene for a possible methamphetamine lab. Based on what he found and his observations of the residence, Trooper Russell concluded that someone had manufactured methamphetamine using the one pot method. On September 15, 2012, Lafayette Police Detective Chad Robinson advised Parks of his Miranda rights, and Parks waived them. Parks was cooperative and admitted to manufacturing methamphetamine.

On September 20, 2012, the State charged Parks with Count I, conspiracy to commit dealing in methamphetamine as a class A felony; Count II, dealing in methamphetamine as a class A felony; Count III, possession of drug precursors as a class C felony; Count IV, possession of methamphetamine as a class B felony; and Count V, possession of a syringe as a class D felony.

At trial, Trooper Russell testified that the danger associated with the one pot method would be possible fire or explosion. The jury indicated that they were not able to reach a decision on Count V, possession of a syringe as a class D felony. The State

moved to dismiss Count V, and the court granted the motion. The jury then returned to deliberate and found Parks guilty of the remaining counts.

At the sentencing hearing, Parks apologized to the community and to his friends and family. Parks stated: "My drug addiction has caused all this and I'm sorry." Id. at 325. The court merged Counts I, III, and IV into Count II. The court found Parks's extensive criminal history, prior failed attempts at rehabilitation, and substance abuse history as aggravators. The court found Parks's family support, cooperation with law enforcement, and the fact that he has the emotional support of his children as mitigators. The court found that the aggravating factors outweighed the mitigating factors. The court sentenced Parks to forty years for Count II, dealing in methamphetamine as a class A felony, and ordered that twenty-six years be executed at the Department of Correction, four years be executed through the Tippecanoe County Community Corrections, and ten years of the sentence be suspended to probation.

## DISCUSSION

The issue is whether Parks's sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Parks argues that his manufacturing was minimal in terms of scope, duration, and product. Parks also asserts that his meth production was consistent with supporting a habit rather than a dealing or manufacturing operation. Parks argues that he was not responsible for the location where the methamphetamine was made because it was not his residence. Parks contends that the nature of the offense compelled a sentence at or close to the statutory minimum for a class A felony. Parks concedes that he has a substantial criminal history, but argues that this history overlapped with his substance abuse issues. Parks also points out that he cooperated with law enforcement, apologized to the court and community, and is a loving father and son.

The State argues that the manufacturing process is dangerous and that Parks admitted that he manufactured methamphetamine in a residential area where young children lived. The State also points to Parks's criminal history, his failure to seek treatment on his own, and his failure to pay child support.

Our review of the nature of the offense reveals that Parks manufactured methamphetamine within 1,000 feet of a family housing complex. Officer Sinks detected a strong odor when he was about ten feet from the entry way. The odor smelled like nail polish remover and became even stronger as he walked closer to the doorway to the point where his eyes began to water. Officer Clark's eyes became "very red" and "watery" due to the smell that was "very strong." Transcript at 59. Trooper Russell testified that the danger associated with the one pot method would be possible fire or explosion. In his interview with Detective Robinson, Parks explained his involvement in manufacturing

5

methamphetamine and told Detective Robinson that someone ditched him with the mixture after it had been activated. The following exchange then occurred:

> [Parks]: Um I guess it was a carrier or whatever but um I ended up stashing it for Dave because he really didn't get much out of it because nothing fell and I went out and stayed at my brother's last night.
>
> [Detective Robinson]: Where'd you stash it?
>
> [Parks]: I actually took it out to my brother's and stashed it in his shed without him knowing because if he f------ knew, he flipped. He's got his kids there.

State's Exhibit 72B at 3.

Our review of the character of the offender reveals that Parks cooperated with the police after initially telling Officer Sinks that there was no validity to the complaint, that there was no meth lab inside, that there were no drugs inside, and that there were no safety concerns for law enforcement or anyone else. As a juvenile, Parks was adjudicated a delinquent for offenses that if committed by an adult would constitute criminal deviate conduct as a class B felony and receiving stolen property as a class D felony in 1996, "[d]ealing in a Look-a-like substance" as a class C felony in 1997, theft in 1999, theft and possession of marijuana in 2000. As an adult, Parks was convicted of operating while intoxicated as a class A misdemeanor in 2003, battery as a class D felony in 2008, and possession of chemical reagents or precursors as a class D felony in 2010. Parks had two petitions to revoke probation filed against him with one being found true.

The PSI reveals that Parks reported first consuming alcohol at thirteen years old and has used marijuana, cocaine, crack cocaine, methamphetamine, suboxone, morphine, klonopin, Lortab, and Norco. As a juvenile, Parks was ordered to complete counseling,

6

the FACT program, and an alcohol and drug education program. As an adult, Parks was ordered to complete an alcohol and drug counseling program in 2003 which he completed. Parks reported participating in counseling at Wabash Valley Hospital between the ages of twelve and thirteen, at The Counseling Center between the ages of ten and fifteen, and at St. Vincent's Stress Center from 2006 to 2008 and from June 2012 until his arrest for the instant offenses.

The PSI indicates that the results of Parks's risk assessment show that his overall risk assessment score puts him in the high risk to reoffend category. Parks has three children who are in relative care. Parks reported being current in his child support at the time of his arrest. The presentence investigation report for Parks's 2010 conviction indicates that Parks reported at that time that he was $7,000 in arrears in child support. The probation officer recommended a sentence of forty years with thirty years executed and the final four years at a level to be determined by community corrections and ten years suspended on probation with the final five years to be unsupervised. After due consideration, we cannot say that the sentence imposed by the trial court is inappropriate.

CONCLUSION

For the foregoing reasons, we affirm Parks's sentence.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.